# United States District Court
## Northern District of Indiana
## Hammond Division

GEORGANN RODRICK,                )
                                                      )
                         Plaintiff,             )
                                                      )
v.                                                   )
                                                      )          Case No. 2:05-CV-274 JVB
SAINT JOSEPH COLLEGE and    )
ERNEST WATSON, JR.,              )
                                                      )
                         Defendants.         )

## OPINION AND ORDER

### A.  Background

Plaintiff Georgann Rodrick was a security officer at Saint Joseph College from March 2003 until April 2004. Saint Joseph's College fired her claiming she has not met its employment expectations. Rodrick, however, believed that she was fired because she complained about her supervisor sexually harassing her. She also thought that her firing was a result of sexual and racial discrimination.

In April 2005, Rodrick, without assistance of counsel, sued under these claims Saint Joseph's College and her former supervisor, Ernest Watson. On September 29, 2005, now with assistance from an attorney, Rodrick amended her complaint to add a battery claim against Watson. On March 7, 2007, Rodrick's attorney withdrew from the case because her relationship with Rodrick deteriorated to the point that she could no longer represent Rodrick in good faith. Currently, Rodrick is proceeding pro se.

In July 2007, Saint Joseph's College and Watson moved for summary judgment. In accordance with *Lewis v. Faulkner*, 689 F.2d 100 (7th Cir. 1982), they advised Rodrick about the

motion and what she needed to do to oppose it. The Plaintiff asked for extension to file a

response, which the Court granted. Now the motion has been fully briefed and is ready for

ruling.

### B.  Summary Judgment Standard

A motion for summary judgment must be granted "if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment,

after adequate time for discovery, against a party "who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing a court of

the basis for its motion and identifying those portions of the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, which it believes

demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the

moving party supports its motion for summary judgment with affidavits or other materials, the

burden of showing that an issue of material fact exists thereby shifts to the non-moving party.

*Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th

Cir. 1986). "Whether a fact is material depends on the substantive law underlying a particular

claim and "only disputes over facts that might affect the outcome of the suit under governing law

will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo,* 840 F.2d 427, 434

(7th Cir. 1988), quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Rule 56(e) specifies that once a properly supported motion for summary judgment is made, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Furthermore, the Northern District of Indiana Local Rule 56.1 specifies that the non-moving party "shall include [in the text of the Response] or appendix thereto, a 'Statement of Genuine Issues' setting forth . . . all material facts as to which it is contended there exists a genuine issue necessary to be litigated."

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995). However,

> In determining the motion for summary judgment, the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the "Statement of Genuine Issues" filed in opposition of the motion.

L.R. 56.1(b).

A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50 (1986).

Generally, pro se litigants are subject to the same waiver rules as litigants represented by counsel. *See Provident Sav. Bank v. Popovich*, 71 F.3d 696, 700 (7th Cir.1995).

**D.  Material Facts**

For the purpose of the Defendants' Motion for Summary Judgment only, the following facts are not in dispute:

Defendant Saint Joseph's College is a private Liberal Arts College with about 1,000 students. Defendant Earnest Watson, Jr., a black man, is the Associate Dean of Student Safety and Security. The Department of Safety is responsible for the safety of the college community.

In March 2003, Watson hired Plaintiff Georgann Rodrick, a white woman, to work as a security officer. Security officers patrol the campus and enforce the school's policies and regulations. They also provide assistance in campus emergencies.

A month after the hire, Rodrick and Watson were riding in a security car when he told her that he had heard she was dating a black man. Rodrick answered that she was married and felt that the question was inappropriate.

In October 2003, Rodrick was in Watson's office. Watson asked her if she would go out with a black man. She answered that she had never been asked out by a black man, to which Watson responded, "Would you go out with me?" Rodrick said no and quickly left the office. As time went on, Watson would frequently ask her, "What can you do for a black man?"

In the beginning of November 2003, Rodrick responded to a call about dorm residents drinking alcoholic beverages. Contrary to the Security Department's procedures, Rodrick failed to obtain information about the students involved in the incident. Furthermore, she allowed the situation to flow out into the hallway. On November 12, 2003, Rodrick received a warning about the incident which outlined the investigation procedures.

Sometime in November, Watson announced that Pam Sigelman, who was hired a month

4

before, would be off for Christmas Eve and Christmas Day because she had a child. Rich Ludington, Watson's friend, also was off for both days. Rodrick was upset about that because she also had a child and she had more seniority than Sigelman and Ludington, but she had to work on both Christmas Eve and Christmas Day.

In December, Rodrick decided "to clear air with [Watson ] and in hopes to make things better between [them]" she told him: "You've never shaken my hand. Let's shake hands." (Pf.'s Ex. 2, Aff. at 2.) Then she extended her arm. Watson forcibly grabbed her hand and squeezed it hard. She said it hurt, pulled her hand away and left. A few days later, Rodrick noticed that her ring was bent and had a jeweler fix it.

In January 2004, Watson evaluated Rodrick's work performance. He discussed with her the need to use procedures in her work, to think through her decisions, and the necessity to communicate with students.

In late February 2004, Watson received an email from Jared Hall, Head Athletic Trainer, complaining that Rodrick had caused a delay in obtaining an ambulance when a player on the visiting men's basketball team had dislocated his shoulder. Hall was concerned that, had there been a major emergency, the college "could have potentially been set up for disaster." (Def. Ex. 2 at 8, Hall Email.) He wrote that it "was obvious to [him] that [Rodrick] did not carry out [the safety department's] protocol." *Id*.

On March 3, 2004, Watson asked Rodrick to email him a list of keys for the exterior doors and fire alarm boxes before she left that night. Watson expressed his frustration that Rodrick had been working on the list since the previous summer, but the task had not been completed. In response, Rodrick sent Watson indecipherable writing rather than the list he

requested. So, on March 11, Watson gave a memo to Rodrick stating his concerns with her job

performance. He noted that the showing up for work was not enough and that she had to be

reliable. Watson also reiterated the need for her to email him the key list. He suggested that, if

Rodrick had trouble using computers, he would help her along.

On March 29, Watson sent Rodrick an email:

Would you explain to me why you are still printing off a key list when I have
asked and shown you how to send it to me by email? I have explained to you why
I wanted it by email and that's how I would like it delivered. I'm not
understanding what I'm going to have to do to make you understand that when I
ask you to do a simple task that you get it done. Let's do this for the last time,
send me the KEY LIST BY EMAIL!

(Df.'s Ex. 2 at 11, Watson's Email.)

Also in March 2004, Rodrick went to Watson's office and saw him viewing pornography

on the computer.[1] He made no effort to hide it from her, and she felt offended and embarrassed.

A few days later, Rodrick tried to check her email when pornography popped up on her

computer screen. She was unable to remove the image and had to ask a student assistant to help

her. The student told her that Watson often used computer to view pornography.

On April 18, 2004, Rodrick submitted a report. According to her report, she approached a

male student and asked him his name and what he was drinking. The student refused to answer.

She tried to turn his hand to read the label on the can but the student jerked away claiming the

beverage was soda pop. Shortly after the incident, the student approached Rodrick, requested her

name, and placed his finger on her right breast to look at her name plate. Rodrick told the student

to keep his hands off her and get out of her face or she would contact the county to arrest him. In

---

[1]The Plaintiff does not give any specific dates.

6

the report, she provided a wrong student's name, causing Watson to call the wrong student into his office to discuss the incident.

That same day, Rodrick submitted another report that revealed her failure to follow procedures. The report stated that she saw persons outside two apartments with beer containers, beer bottles, beer cups, and beer glasses. She asked the persons to identify themselves but they did not cooperate. According to Watson, Rodrick failed to follow security procedures, which required that she get and keep their IDs.

The following day, April 19, Watson told Human Resources Director Nancy Studer about his concerns with Rodrick and recommended that her employment be terminated. Watson told Studer that Rodrick was not a bad person; she was just not performing acceptably as a security officer. Watson told Studer that he would recommend that she apply for other open positions at the College. Watson believed that Rodrick could not continue in her position because the performance issues she exhibited could jeopardize the safety and security of the students and others on campus.

Later that day, Studer discussed the situation with Vice President of Business Affairs Randall Freebourn. In light of the previous incidents and counseling Rodrick received, both of them agreed with Watson's recommendation to fire Rodrick. Studer then relayed the information to Watson.

In the evening, Watson met with Rodrick to discuss the April 18 incidents and her inability to work as a security officer. He told her that her employment would be terminated, but that she could apply for other positions at the College.

The following day, Rodrick sent Watson an email, in which, among other things, she

wrote: "I have been thinking about what we talked about. I love working in Security. I feel horrible that I screwed up again. You definitely do not need this. I am going to take your advice and try to transfer to another department." (Df.'s Ex. 2, Pl.'s Email.) She then applied for a secretary position in the Office of Admissions.

On April 26, Rodrick met with Studer. During the meeting, Rodrick claimed that Watson was harassing her. Studer told her that Rodrick needed to speak with Watson, but she objected stating that Watson was the one harassing her. Studer then suggested that she speak with Dean Keller. Rodrick explained that she did not want to speak with Dean Keller because he and Watson had offices next to each other and both of them shared the same secretary. Rodrick insisted on speaking with Studer.

When Studer asked for the basis of her complaint, Rodrick told her that Watson was demeaning to her; he rarely returned her phone calls; she tried to meet with him multiple times but he would not make time for her; there was high turn over in his department indicating a problem with his management; Watson created animosity among the officers; Watson was very firm with the students, sometimes to the point of making them cry; and Watson told her she was not doing her job. Despite these complaints, Rodrick did not think that Watson was treating her differently than others. Rodrick told Studer that she did not want to be terminated over a typing error.

Sometime after Rodrick saw Watson view pornography on the computer but before she spoke with Studer, Rodrick tried to contact Watson to complain about the computer being used to view pornography, but he would not return her calls. She also scheduled a meeting with him but he did not show up. Eventually, she was able to speak with him about the issue but he told

8

her, "If you talk to me about this, you'll be fired." (Pf. Ex. 2 at 3.) In her affidavit, Rodrick does

not state when she spoke to Watson, but she does indicate that it was before her April 26 meeting

with Studer. In addition, since Rodrick's affidavit does not contradict the nature of her April 19

conversation with Watson—namely, that she was getting fired—one has to infer that the above

exchange took place before this meeting as well.

On April 30, Watson handed Rodrick a termination letter.

**F.  Discussion**

**(1)  *Disparate Treatment Claims***

(a)  *Race and Gender Discrimination*

Rodrick does not present any direct evidence of race or gender discrimination. Therefore,

she can prevail against the Defendants' motion for summary judgment on this issue only if she

can present indirect evidence of racial or gender discrimination by way of the *McDonnell*

*Douglas* method. Under this method, a plaintiff claiming gender discrimination has the initial

burden to establish a prima facie case by showing that (1) she is a member of a protected class;

(2) she suffered an adverse employment action; (3) she was meeting her employer's legitimate

performance expectations; and (4) her employer treated similarly situated employees who were

not in the protected class more favorably. *See Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 289

(7th Cir. 1999). The same test applies to Rodrick's race discrimination claim, except for the first

part of the prima facie case. *See Phelan v. City of Chi.*, 347 F.3d 679, 684 (7th Cir. 2003)

("[I]n . . . cases of 'reverse discrimination,' the first prong of the *McDonnell* test cannot be

used."). There, Rodrick "must show 'background circumstances' that demonstrate that a

particular employer has 'reason or inclination to discriminate invidiously against whites' or evidence that 'there is something "fishy" about the facts at hand.'" *Id*. (citations omitted).

If Rodrick can establish a prima facie case of race and gender discrimination, the burden shifts to the employer to state a legitimate nondiscriminatory reason for the firing. If the employer can do that, the burden shifts back to Rodrick to show the employer's stated reason is pretextual, that is, unworthy of credence. *Id*. She can accomplish this by

> showing with evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge. These formulations are simply different ways of recognizing that when the sincerity of an employer's asserted reasons for discharging an employee is cast into doubt, a factfinder may reasonably infer that unlawful discrimination was the true motivation.

*Testerman v. EDS Technical Products Corp.*, 98 F.3d 297, 303 (7th Cir. 1996) (citations omitted). "We look not at the wisdom of the employer's decision, but rather at the genuineness of the employer's motives." *Stalter*, 195 F.3d at 289.

Rodrick's prima facie case of both race and sex discrimination fails because she cannot meet the fourth requirement of the standard, as she presents no similarly situated employees who were not in the protected class but who were treated more favorably than she was. This failure dooms Rodrick's discrimination claims, and the Court needs not delve into other parts of the *McDonnell Douglas* test. *See Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007).


**(2) *Hostile Work Environment Claims***

(a)  *Racial and Sexual Harassment*

Rodrick claims that Watson harassed her because she was white and because she was a woman. To succeed on these claims she has to show that her work environment was both

subjectively and objectively offensive. *Boumehdi v. Plastag Holdings*, 489 F.3d 781, 788 (7th Cir.2007). To rise to the level of objectively hostile, conduct must be sufficiently severe or pervasive that a reasonable person would find it hostile, and that the person exposed to such conduct must subjectively perceive the environment as abusive. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (sexual harassment case); *see also Johnson v. City of Fort Wayne*, 91 F.3d 922, 938 (7th Cir. 1996) (racial harassment case). In determining whether conduct meets these standards, courts look at "the totality of circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. Title VII is not a code of civility nor is it designed to purge the workplace of vulgarity and boorish behavior. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *see also Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 806 (7th Cir. 2000).

Rodrick complains that in April 2003, Watson told her that he heard she was dating a black man. Rodrick answered that she was married and felt that the question was inappropriate. Six months later, in October 2003, Watson asked her if she would go out with a black man. She answered that she had never been asked out by a black man to which Watson responded, "Would you go out with me?" Rodrick said no and left the office. As time went on, Watson would frequently ask her, "What can you do for a black man?" In March 2004, Rodrick saw Watson in his office viewing pornography on computer. He made no attempt to hide it. Couple days later, a pornographic image popped up on her computer screen as she tried to check her email.

These instances, although unwelcome by Rodrick, do not rise to the level of sexually

hostile work environment. They are too isolated and not severe enough to be actionable. *Cf.*
*Koelsch v. Beltone Elec. Corp.*, 46 F.3d 705, 708 (7th Cir. 1995) (finding offensive remarks and
two incidents of physical contact by supervisor, including grabbing of plaintiff's buttocks, did
not rise to the level of actionable sexual harassment); *Weiss v. Coca-Cola Bottling Co.*, 990 F.2d
333, 337 (7th Cir. 1993) (finding male co-worker's several incidents of unwanted touching,
attempts to kiss, placing "I love you" signs in work area, and asking plaintiff out on a date did
not create a hostile environment). Rodrick has offered no evidence that Watson's conduct
interfered with her work or that it otherwise created an abusive work environment.

Similarly, Watson's racial remarks to Rodrick are not severe enough to constitute a Title
VII claim. *Cf., e.g., Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1272 (7th Cir. 1991) (finding
racial harassment where plaintiff was subjected to racial threats and derogatory nicknames).


**(4)** *Retaliation*

Retaliation, like the claims of discrimination, may be shown through the direct or indirect
methods. The indirect method follows the *McDonnell Douglas* pattern. Under the direct method,
a plaintiff may overcome summary judgment by presenting direct or circumstantial evidence of
the decision maker's retaliatory motive. Direct evidence, as normally understood in a retaliation
case, consists of an admission retaliation was the reason for adverse employment action. *See*
*Sylvester v. SOS Children's Villages Ill., Inc.*, 453 F.3d 900, 905 (7th Cir. 2006). Circumstantial
evidence is the kind of evidence from which a reasonably jury can infer the unlawful motivation
on the part of the decision maker. *See id.*

In her affidavit, Rodrick has presented circumstantial evidence that Watson decided to

fire her because she complained about him viewing pornography. Rodrick saw Watson viewing pornography sometime in March, and he made no effort to hide it from her. A few days later, as Rodrick was trying to check her email, a pornographic image popped up on her screen, which she was unable to remove herself. She had to ask a student assistant to help her.

After these occurrences, Rodrick attempted to speak with Watson, but he would not return her calls. Eventually, she was able to speak with him about the issue, but he told her, "If you talk with me about this, you'll be fired." Next time she met with him, on April 19, he told her she would be fired because of her incompetence as the campus security officer. Rodrick's complaint about the existence of pornography at work was a protected activity, and her being fired after threats from Watson creates an issue of whether she was fired for insufficient work performance or for exercising her federally protected right. This question can be answered by the jury only. Therefore, the Court will deny the Defendants' motion for summary judgment as to Rodrick's retaliation claim.

**(5)** *Battery*

Rodrick also alleges that Watson committed battery when she extended her arm to him and offered a handshake. Battery is a question of state law, which the Court addresses under the doctrine of supplemental jurisdiction.

In their motion for summary judgment, the Defendants only state that Rodrick's battery claim should be dismissed if the Court grants summary judgment as to all of her other claims. Since the Defendants provide no other basis for dismissing Rodrick's battery claim, the issue of whether Watson committed battery will be decided by a jury.

**(G)  Conclusion**

For these reasons, the Court grants in part and denies in part the Defendants' Motion for

Summary Judgment (DE 32).

The Court sets an in person trial scheduling conference for Thursday, May 15, 2008, at

1:00 pm, C.D.T., in Courtroom 4200 of the Hammond Division Courthouse.

SO ORDERED on April 30, 2008.

s/ Joseph S. Van Bokkelen
Joseph S. Van Bokkelen
United States District Judge
